[Civ. No. 38521. Second Dist., Div. Five. Mar. 24, 1972.]

TONY GUTIERREZ, as Administrator, etc., Plaintiff and Respondent, v. ASCENCION C. ALVARADO, Defendant and Appellant.

## Counsel

Virgil Becker for Defendant and Appellant.

Bertram S. Harris for Plaintiff and Respondent.

## Opinion

**KAUS, P. J.**—Assault and battery. After a court trial judgment for $6,000 damages in favor of the plaintiffs Henrietta Gutierrez and $1,000 in favor of the plaintiff Tony Gutierrez was entered. Defendant appeals.

■    On February 23, 1972, less than a month before oral arguments in this matter were scheduled to be heard, respondent[1] moved to dismiss the appeal as moot.

From the documents before us the following appears: in late March 1971, execution was levied on real property owned by appellant. A sale was noticed for May 19. It was continued to June 4. In consideration of a further continuance to September 10, appellant signed a handwritten agreement pursuant to which the case was to be "settled" for a total of $7,000, $2,000 of which were paid forthwith, the balance on or before September 10. The appeal was then to be dismissed and satisfaction of judgment entered. If the balance was not paid, the sale was to take place. Later in June 1971, division one of this court denied a petition for a writ of supersedeas. The balance of $5,000 was not paid by September 10, and the property was sold for $5,450.04 to the respondent. On December 21, 1971, counsel for appellant mailed a check in the sum of $5,452.12 to counsel for respondent, this sum to cover the balance due on the judgment, the sheriff's costs of sale and the recording of the sheriff's deed. The letter contained the following paragraph: "It is understood that if and in the event the judgment is affirmed on the pending appeal, that an additional sum of $97.04 will be due to plaintiffs for interest accrued up to and including December 10, 1971, the agreed date for termination of accrual of such interest."

Thereafter on December 27, 1971, respondent signed a certificate to the effect that the property had been redeemed pursuant to the provisions of section 703 [*sic*] of the Code of Civil Procedure.

The question whether the appeal was subject to dismissal would be an extremely close one had counsel for respondent not accepted the December 1971 check without protesting appellant's evident intention to go through with the pending appeal. He thus impliedly agreed with appellant's interpretation of the June 4 agreement to the effect that the appeal was only to be dismissed in the event the $5,000 payment was made on or before September 10. Obviously that agreement, pursuant to which respondent would have received no more than an even $7,000, was never executed. Respondent did not hesitate to accept interest and costs of almost $500, plus a

---

[1]The respondent Henrietta died after judgment. On November 5, 1971, another division of this court, having been presented with a certified copy of a substitution of plaintiffs, ordered that the respondent Tony Gutierrez, the administrator of Henrietta's estate be substituted as plaintiff and respondent. The death of the plaintiff Henrietta does not affect the judgment. (Code Civ. Proc., § 669; *Norton* v. *City of Pomona*, 5 Cal.2d 54, 61-63 [53 P.2d 952]; *Fowden* v. *Pacific Coast Steamship Co.*, 149 Cal. 151, 153-155 [86 P. 178].)

promise of an additional $97.04 for accrued interest. Both the money and the promise were tendered on condition that the appeal continue.

The entire picture is hardly one of a voluntary payment; everything happened because of the execution. The motion to dismiss the appeal must be denied. (*Reitano* v. *Yankwich,* 38 Cal.2d 1, 3 [237 P.2d 6].)

We turn to the merits.

The shooting incident out of which this action arose occurred at Juanita's Cafe on New Year's eve 1966. The date may explain the discrepancies in the testimony of various witnesses. These are dwelled upon at some length in appellant's brief. However since his liability is solidly based on the testimony of Henrietta, we need not set forth more than her version of the incident.

On the evening in question she was helping her husband in his cafe. Appellant, whom she had met once, entered with his wife and two nephews. He ordered beers from Henrietta. When he was served by Tony, Henrietta's husband, he said: "I want to make you dance." He then pulled a revolver from his pants and shot three times at Henrietta's feet. Henrietta was in shock. She did not want to say anything to her husband—who was apparently no longer around—because he might get angry. She could not even move. Then somebody asked her for a burrito and she went to the kitchen to prepare it. She could then see her legs bleeding. Her stocking was burned. She went back to appellant's table and said: "Look what you done to me." Appellant then assured her that she would be all right and started to dance with her. She then went back into the kitchen and laid down for a half hour. She told her husband what had happened. She could not work any more that night.

At the time of this incident Henrietta was three months pregnant. She started to bleed a little every day for about a week. She went to see her doctor and took to bed to save her baby. Her seven other children took care of the house. All had been normal births. She miscarried on February 3. She has been continuously sick since the miscarriage.[2]

Cross-examination developed, among other things, that there had been bad blood between appellant as the owner of the property on which Juanita's Cafe was located, and Tony. Apparently the cafe had been leased to Mr. Hernandez who lost money on it and Tony took over the business, allegedly without appellant's consent. He had brought some kind of legal action to remove Tony.

---

[2]The trial took place almost four years after the shooting.

There is evidence in the record that appellant's revolver was filled with blanks.

The only medical evidence in the case, produced by appellant, was that Henrietta's miscarriage was not caused by the shooting. The court so found, but also found that Henrietta believed that she lost her baby because of the shooting incident. As noted, the court awarded her $3,500 compensatory damages, and $2,500 in punitive damages.

With respect to the damages claimed by Tony the court found as follows:

"10. That HENRIETTA GUTIERREZ was and is the Mother of seven children, and assisted her husband, Plaintiff TONY GUTIERREZ on weekends and during rush periods her services as a waitress and helper at JUANITA'S CAFE, and did also take care of the home of the Plaintiff, TONY GUTIERREZ and the children, as well as performing her wifely duties to the Plaintiff, TONY GUTIERREZ prior to said shooting.

"11. That HENRIETTA GUTIERREZ was unable to perform her wifely duties, to take care of her home and children, and assist Plaintiff, TONY GUTIERREZ, in the operation of JUANITA'S CAFE, after January 1, 1967."

From this the court concluded:

"5. That Plaintiff, TONY GUTIERREZ, suffered the loss of consortium, all to his damages in the sum of $1,000.00."

Appellant's points on appeal are not separately stated. We gather that his main argument is that there was such a conflict among the witnesses on both sides that the evidence as to liability and damages is not supported by the record. In particular it is claimed that the evidence of mental suffering on the part of the plaintiff could not be true. These arguments were properly, but vainly addressed to the trial court. They present questions of fact which we cannot touch.

■ We are satisfied that Henrietta was entitled to recover for her emotional distress even though she erroneously believed that her miscarriage resulted from the shooting incident. Under the circumstances her belief was certainly not unreasonable. Athough it may be granted that any miscarriage causes a certain amount of emotional distress, the shooting incident caused plaintiff's distress to be of a rather special kind. Defendant took his victim as he found her.

■ We cannot, however, affirm the judgment in favor of Tony. First, there is really no substantial evidence in the record that the loss of Henrietta's services—using that term in the broadest possible sense—was any

greater than it would have been had she merely suffered a miscarriage without the preceding shooting incident.[3]

Further, we must assume that when the court referred to "wifely duties" in its findings, it was talking about the noneconomic consequential damages suffered by Tony. These, of course, are not recoverable. (*West* v. *City of San Diego,* 54 Cal.2d 469, 475-478 [6 Cal.Rptr. 289, 353 P.2d 929].) No attempt to segregate such damages from economic damages was attempted. In fact the court's eventual conclusion that Tony suffered "loss of consortium . . . to his damages in the sum of $1,000.00" ignores recoverable damages altogether. The loss of consortium is precisely what is not recoverable. (*West* v. *City of San Diego, supra,* 54 Cal.2d 469; *Meek* v. *Pacific Electric Ry. Co.,* 175 Cal. 53, 56 [164 P. 1117].)

The motion to dismiss the appeal is denied.

The judgment in the sum of $6,000 in favor of Tony, as the administrator of the estate of Henrietta, is affirmed.

The judgment in the sum of $1,000 in favor of Tony in his own right, as the husband of Henrietta, is reversed. The case is remanded to the superior court for a new trial on the issue of Tony's damages only.

Stephens, J., and Aiso, J., concurred.

---

[3]We have flyspecked the record on that point. The closest we come is the following from Tony's testimony: "Q. Now, what has been the condition of your wife's health since then? A. Well, she never be able to do the work in the house, and she has been too nervous and she been sick all the time. She has been three times in the hospital. I don't know whether for the same thing, but she was never sick before, but after that it was one thing and another."